Filed 5/2/23  P. v. Orozco CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ELISEO OROZCO,<br><br>    Defendant and Appellant. | F083006<br><br>(Super. Ct. No. F18904371)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Gary R. Orozco, Judge.

Spolin Law, Aaron Spolin and Jeremy Cutcher for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, Kari Mueller and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted Eliseo Orozco (appellant) of second degree murder (§ 187, subd. (a); count 1)[1] and willful, deliberate, and premeditated attempted murder (§§ 664/187, subd. (a); count 2). As to each count, the jury found true a gang enhancement (§ 186.22, subd. (b)(1)) and a firearm enhancement (§§ 12022.53, subd. (d), 12022.5, subd. (a)). The trial court sentenced appellant to 55 years to life plus four years in state prison.

Appellant was not convicted until his third trial. His first trial ended in a mistrial because the jury deadlocked on the verdict. His second trial ended in a mistrial before the close of evidence because the trial court discharged several jurors for good cause and ran out of alternates.

On appeal, appellant contends the trial court erred in admitting the prior testimony of three witnesses to the murder. We conclude the People exercised reasonable diligence in attempting to procure the attendance of the witnesses, and therefore, admission of the prior testimony was proper. We also reject appellant's claims that defense counsel was ineffective for failing to object to the trial court's facemask requirements, and that appellant is entitled to the retroactive application of Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1). We affirm.

## FACTUAL BACKGROUND

On June 28, 2018, Juan Rangel was driving his vehicle with his cousin, Luismar Rangel,[2] in the front passenger's seat. Around 7:30 p.m., they drove past the Frank H. Ball Recreation Center on Inyo Street. A group of individuals at the recreation center walked out to the street, raised their arms, and started yelling obscenities. Appellant, who

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] For clarity, we refer to Juan Rangel and Luismar Rangel by their first names. No disrespect is intended.

was among that group, drew a semiautomatic handgun, ran toward Juan's vehicle, and fired eight shots. One of the bullets struck Juan in the head, killing him.

The vehicle continued down Inyo Street for several blocks until it crashed into a tree. Luismar was not hit by any bullets but suffered several lacerations from the collision. After the vehicle came to a stop, Luismar exited the car and fled, but returned to the scene after law enforcement arrived. He was interviewed by detectives but claimed he could not identify the shooter.

Sisters Ontejeah, Shanet'e, and Taeya Alberty[3] (the Alberty sisters) lived near the recreation center and were there when the shooting occurred. They were each interviewed by detectives. Taeya told detectives she saw appellant shoot a handgun at a vehicle as it travelled past the recreation center. Ontejeah and Shanet'e each stated they did not witness the actual shooting but heard gunshots and saw appellant running toward a vehicle in the street. Taeya and Shanet'e described appellant as wearing black square-framed glasses.

The Alberty sisters knew appellant from school and had seen him at the recreation center and around the neighborhood. They each identified appellant in a photographic lineup.

Ontejeah told detectives that immediately after the shooting, she saw their neighbor, Eddie Vasquez, arrive in his black Corvette. A person got into the front passenger's seat of the Corvette, then Vasquez drove away from the scene. She was unable to identify the front passenger.

An employee at the recreation center testified that on the afternoon of the shooting, he checked out a basketball to appellant and another male. The employee was familiar with appellant and for the last several years had seen him at the recreation center

---

**3**      For clarity, we refer to Ontejeah, Shanet'e, and Taeya Alberty by their first names. No disrespect is intended.

two to three times per week. Later that evening, around 7:00 p.m., he saw appellant standing with three or four other males near the front entrance to the recreation center on Inyo Street. Approximately 20 minutes later, he heard several gunshots.

Appellant was arrested the day after the shooting. When detectives went to his residence, appellant's father gave them a pair of black square-framed glasses.

Officers seized Vasquez's Corvette from his residence and processed it for evidence. Fingerprints matching appellant were found on the exterior of the front passenger door window.

After his arrest, appellant was interviewed by detectives at a police station. Appellant maintained he was not the shooter. He initially told the detectives he was not at the recreation center on the day of the shooting. Later in the interview, he claimed he walked past the recreation center sometime during the afternoon and stopped in front to smoke marijuana with a group of people he did not know. He also denied knowing Vasquez.

The People introduced evidence that appellant and Vasquez were members of the Sureños, a criminal street gang. They also introduced evidence that Juan and Luismar were members of the Norteños, a rival criminal street gang. Based on a hypothetical mirroring the facts of the instant case, the People's gang expert opined that the shooting was committed for the benefit of the Sureños, noting that the shooting occurred in Sureño territory, and that the victims were members of a rival gang.

In the defense case-in-chief, appellant called several family members who testified appellant was at his residence at the time of the shooting. Appellant also called an identification expert, who discussed potential issues with law enforcement identification procedures.

4.

**DISCUSSION**

**I.     Admission of the Prior Testimony of the Alberty Sisters was Proper.**

Prior to trial, the People moved to admit prior testimony of the Alberty sisters pursuant to Evidence Code section 1291. Following an evidentiary hearing, the trial court granted the motion, finding the People exercised reasonable diligence in their attempt to procure the Alberty sisters' attendance at trial, and therefore they constituted unavailable witnesses pursuant to Evidence Code section 240, subdivision (a)(5).

Appellant contends the trial court's finding of reasonable diligence was erroneous. We disagree. As we explain below, the record amply demonstrates the People's efforts were sufficiently timely, extensive, and thorough to warrant the finding of unavailability.

**A.     Background.**

***1.     Relevant procedural history.***

The Alberty sisters testified at appellant's preliminary hearing on April 25, 2019. They also testified at appellant's first trial on November 18, 2019.

Appellant's second trial began on October 20, 2020. One day before, the court held an evidentiary hearing outside of the presence of the jury regarding the unavailability of the Alberty sisters and granted the People's motion to admit their prior testimony. However, the trial court declared a mistrial on October 26, 2020, before the prior testimony was admitted into evidence.

Appellant's third trial, the subject of the instant appeal, began on October 29, 2020. The parties agreed that the trial court's rulings on pretrial motions from the second trial would be incorporated into the third trial. During the third trial, the trial court admitted the transcripts of the Alberty sisters' preliminary hearing testimony and testimony from appellant's first trial, which was read into the record. The trial court also admitted evidence of the Alberty sisters' prior statements to law enforcement, as well as video recordings of their identifications of appellant in photographic lineups.

## 2. *Evidentiary hearing on unavailability*

The sole witness at the evidentiary hearing on unavailability was Jennifer Machado, an investigator with the Fresno County District Attorney's Office assigned to the homicide unit.

Machado testified that on August 25, 2020, she was assigned the task of locating the Alberty sisters and procuring their attendance at appellant's third trial. She began by looking for updated contact information for the Alberty sisters, and for their mother, in several local and state law enforcement and government databases.

On August 31, 2020, Machado attempted service at the residence where the Alberty sisters had been served subpoenas for prior proceedings. There was no answer at the door. She then went to the high school that Taeya last attended and spoke with the school resource officer. The officer provided Machado with another address listed with the school. Machado attempted service at that address, but found the apartment was vacant, and confirmed with the onsite manager that no one with the last name Alberty lived at the complex.

The next day, Machado contacted a supervisor with Fresno County Social Services and confirmed the Alberty sisters' mother passed away in February 2020. The supervisor provided Machado with the last known address for Ontejeah and Taeya, which was in Carmichael, California. Machado then spoke with Gary Dahl, an investigator for the Sacramento County District Attorney's Office, and requested he attempt to make contact at the Carmichael address. Dahl later informed Machado he went to the address and discovered Ontejeah and Taeya no longer resided there and that a new tenant had moved in. Dahl also told Machado he checked local law enforcement databases and found no record of any of the three sisters.

On September 14, 2020, Machado located a Fresno Police Department report from April 2020 in which a woman named Vanisha Johnson identified herself as Taeya's

6.

guardian. Machado spoke with Johnson at her Fresno address. Johnson stated she was not the legal guardian of any of the Alberty sisters and did not know their whereabouts.

The same day, Machado discovered through a public assistance database the locations where the Alberty sisters had used their Electronic Benefits Transfer (EBT) cards over the last several weeks. The database showed usage in Fresno, Sacramento, Carmichael, Madera, and Modesto. Machado explained there was no pattern to the usage that would assist her in determining their future whereabouts.

On September 21, 2020, Machado returned to the address where the Alberty sisters had originally been served subpoenas for prior proceedings. There, she contacted the Alberty sisters' grandmother, who told her she had not seen them in months. Their uncle, who resides there, also did not know their whereabouts.

The next day, Machado conducted further database checks for a person named Cameron Sanders who she believed may have been the boyfriend of Shanet'e. His last known address was the address in Carmichael that Dahl had visited. She conducted additional records and social media checks looking for evidence of another address but found none. Machado also conducted database searches for the father of the Alberty sisters and discovered an address in Riverdale. She went to the address but was told the previous tenants had moved out in September. She was unable to locate additional addresses or a phone number for the father.

Machado continued to conduct weekly database and social media searches up until trial. She was unable to locate any new addresses or other relevant information.

During her social media searches, Machado located Facebook accounts she believed may belong to each of the Alberty sisters. She explained she did not use the Facebook messenger function to attempt to contact the Alberty sisters because she believed they were attempting to avoid service and alerting them that she was looking for them would make it more difficult to effectuate service. Machado also explained that witnesses in homicide cases often do not want to testify for fear of retaliation.

7.

At the conclusion of the hearing, the trial court found the People exercised reasonable diligence based on the totality of Machado's efforts. However, the court directed the People to continue their efforts to locate the Alberty sisters through the end of trial.

Machado updated the court on her efforts on November 4, 2020, immediately before the Alberty sisters' prior testimony was admitted at trial. She testified that since the evidentiary hearing she alternated daily between searching electronic databases and social media. She was unable to locate additional leads or other relevant information.

Machado again updated the court on her efforts on December 9, 2020, near the conclusion of trial. She testified that on November 9, 2020, she obtained a report from the Fresno Police Department's record system that listed Ontejeah as a witness with an address in Fresno. She went to that address and spoke with a male who said Ontejeah was a friend of a friend, was not at the apartment, and that he believed she was in the Sacramento area.

The next day, Machado conducted an extensive search on multiple social media pages and concluded that Sanders was actually Ontejeah's boyfriend. She asked Dahl to check his local databases for any information about Sanders, and Dahl located a carjacking report for Sanders with the same Carmichael address he previously visited. Dahl went to the address and contacted a woman who would only identify herself as the mother of Ontejeah's boyfriend. The woman stated Ontejeah does not live there but that she would be willing to pass on a message, and Dahl provided her with Machado's contact information. The next day, Machado received a phone call from a female identifying herself as Ontejeah Alberty. She stated she was unable to travel to Fresno because she was due in 10 days with a high-risk pregnancy and could go into labor at any time. She refused to provide her exact location and would not provide contact information for either of her sisters. After the call, Machado attempted a reverse phone number lookup but was unsuccessful.

Based on Machado's testimony, the trial court found the People had continued to exercise reasonable diligence and allowed Machado to cease her efforts.

**B.      Applicable legal principles**

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.)  That right is not absolute, however.  An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination.  Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial." (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*).)

"[T]he exception to the confrontation right for prior recorded testimony is codified in [Evidence Code] section 1291, subdivision (a)." (*Cromer*, *supra*, 24 Cal.4th at p. 898.)  This subdivision provides, in pertinent part: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] ... [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a).)  Evidence Code section 240, subdivision (a)(5), defines the term "unavailable as a witness" as:  "Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

"In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440 (*Sánchez*).)  "[T]he term 'due diligence' is

9.

'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " (*Cromer*, *supra*, 24 Cal.4th at p. 904.) "Relevant considerations include the timeliness of the search, the importance of the witness's testimony, and whether leads were competently explored." (*Sánchez*, *supra*, 63 Cal.4th at p. 440.)

"The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially." (*Sánchez*, *supra*, 63 Cal.4th at p. 440.)

## C. The People exercised reasonable diligence in attempting to procure the attendance of the Alberty sisters.

Having reviewed the record in its entirety, we agree with the trial court's conclusion that Machado exercised reasonable diligence. Her efforts to locate the Alberty sisters were extensive and thorough. She utilized numerous law enforcement databases, government databases, and social media to determine their whereabouts. She personally attempted service at several addresses and attempted to contact family and friends in the area. She enlisted the help of other government resources, including Sacramento County investigators, social services, and Taeya's school resource officer. She promptly pursued any lead she received.

Machado's efforts were also timely. She began her search on August 25, 2020, two months before the start of appellant's second trial. She continued searching until the end of appellant's third trial, over three months later. There is nothing in the record to suggest that Machado did not have enough time to conduct a thorough search. Notably, appellant does not identify any promising leads that Machado was unable to investigate. It is also significant that the trial date for the second trial was not set until August 20, 2020. Prior to the setting of the second trial date, "resort to the subpoena or 'material witness' processes would have been premature." (*People v. Hovey* (1988) 44 Cal.3d 543, 564.)

10.

Despite this, appellant contends Machado's search was not diligent because she could have taken certain additional measures. Specifically, appellant claims Machado should have revisited potential addresses, visited stores where the Alberty sisters used their EBT cards, and attempted to make contact through Facebook messenger. We are not persuaded. " 'Where the record reveals, ... that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.] The law requires only reasonable efforts, not prescient perfection.' [Citations.]" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.) "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness[es]." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298, abrogated on another ground by *People v. Merritt* (2017) 2 Cal.5th 819, 821–822.)

In any event, it is apparent from the record there is no reason to believe appellant's proposed measures would have changed the outcome of Machado's search. Revisiting addresses without additional leads or visiting stores where the Alberty sisters used their EBT cards without some clear pattern of when and where the cards were used, would have been speculative and wasteful, amounting to no more than a random guessing. Moreover, messaging the Alberty sisters through their Facebook accounts would have been counterproductive, because as Machado explained, it was apparent they were actively attempting to avoid service. The People are not obligated " 'to exhaust every avenue of inquiry, no matter how unpromising' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 677, quoting *Hardy v. Cross* (2011) 565 U.S. 65, 71–72.)

Finally, appellant claims the People should have known the Alberty sisters would attempt to avoid service, and therefore did not exercise reasonable diligence in preventing them from becoming absent in the first place.

11.

We agree, as does respondent, that the People were aware the Alberty sisters were uncooperative witnesses. Machado testified that she was involved with escorting the Alberty sisters to and from court in prior proceedings and agreed with this assessment. Their lack of cooperation was also reflected in the transcript of their testimony from the first trial, during which they stated they did not want to be there, refused to answer simple questions, and claimed to have almost no memory of the shooting. Ontejeah and Taeya were also treated as "hostile" by the People. However, while the People had reason to believe the Alberty sisters were likely to be uncooperative in a subsequent trial, they had no affirmative indication they were likely to leave the area or actively avoid service.

Regardless, the People's ability to prevent the absence of the Alberty sisters during the approximate eight-month window between the end of the first trial and the setting of the second trial date was extremely limited. As our high court has explained: "[W]e could not properly impose upon the People an obligation to keep 'periodic tabs' on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply 'disappear,' long before a trial date is set." (*People v. Hovey*, *supra*, 44 Cal.3d at p. 564.) Prior to the setting of a second trial date, use of the "court's process" was premature. (Evid. Code, § 240, subd. (a)(5).) While appellant complains the People should have done more to prevent the Alberty sisters' absence, he does not explain what steps the People could have taken before the trial date was set to ensure the Alberty sisters' appearance.

Appellant relies on *People v. Louis*, which held that the People's duty is not only "to act with due diligence in attempting to make an absent witness present," but to " 'use reasonable means to prevent a present witness from becoming absent.' " (*People v. Louis* (1986) 42 Cal.3d 969, 991 (*Louis*).) There, a witness was in custody on unrelated charges. (*Id.* at p. 990.) The prosecution agreed to release the witness before the defendant's trial on his own recognizance to spend the weekend with an unidentified

12.

friend at an undisclosed address. (*Ibid.*) The prosecutor agreed to the release even though the witness had a long criminal record, a history of failing to appear in court, and mental health issues. (*Id*. at p. 989.) Upon release, the witness "promptly disappeared." (*Id.* at p. 978.) At the defendant's trial, the trial court found the witness was unavailable and admitted his prior testimony. (*Ibid.*) *Louis* reversed, holding the People "failed to exercise virtually any effort to prevent [the witness] from becoming absent." (*Id.* at p. 991.) The court also concluded the prosecution's failure may have been based on "something other than mere indifference," suggesting the prosecution may have hoped the witness would disappear, because he "would not look as good in person as he does in reading out of the transcript." (*Id.* at p. 993, fn. 7.)

Since *Louis* was decided, our high court has observed that "[t]he circumstances in *Louis* were unusual" (*People v. Thomas* (2011) 51 Cal.4th 449, 500) and that "[s]ubsequent cases have limited the holding in *Louis* to its peculiar facts." (*Id.* at p. 502.) *Louis* is similarly inapplicable here. The Alberty sisters were not in custody. They were not facing pending criminal charges. The People did not have the option to hold them in custody. In fact, after their testimony in the first trial was completed, they were no longer legally obligated to communicate with the prosecution or provide updated contact information. As we explained above, there was nothing the prosecution could have done to compel their appearance until the second trial date was set.

We also reject appellant's claim that, as in *Louis*, the People hoped they would be unable to locate the Alberty sisters and instead admit their prior testimony. There is nothing in the record to support this claim, and it is wholly undermined by the People's extensive efforts to locate the Alberty sisters, which continued through the end of appellant's third trial.

In conducting this independent review of the People's efforts, we are mindful that the Alberty sisters' testimony, and their identification of appellant, was important to the prosecution's case. (See *Louis*, *supra*, 42 Cal.3d at p. 991.) Nonetheless, we conclude

the prosecution's extensive and diligent efforts were commensurate with the importance of the witnesses. Accordingly, we find the prosecution exercised reasonable diligence, and appellant's claim lacks merit.

## II.    The Trial Court's Facemask Requirements During the COVID-19 Pandemic did not Violate Appellant's Right to Confrontation. Trial Counsel did not Render Ineffective Assistance by Failing to Object.

Appellant's trial occurred in the Fall of 2020 during the COVID-19 pandemic. (See *People v. Edwards* (2022) 76 Cal.App.5th 523, 526 [noting that as of November 2020, COVID-19 had killed over 200,000 Americans.) As such, the trial court employed certain measures to limit the spread of pathogens in the courtroom, including the use of facemasks. While the record is ambiguous on this point, it appears the trial court allowed some witnesses to wear a facemask while testifying and may have required appellant to wear a facemask throughout the trial. Appellant contends these requirements violated his right to confrontation under the Sixth Amendment, and that his counsel was ineffective for failing to object. We disagree. We conclude any requirement that trial participants wear facemasks furthered the important public policy of preventing the spread of COVID-19 without undermining appellant's confrontation right. (*See Maryland v. Craig* (1990) 497 U.S. 836, 850 (*Craig*).)

### A.    Background

The trial court's facemask requirements are not summarized in detail in the record. At several points, the record indicates appellant was wearing a facemask, but it is unclear if he was required to do so. For purposes of our discussion, we assume appellant was required to wear a facemask throughout the trial.

With respect to testifying witnesses, the trial court generally gave witnesses the option of wearing or removing their facemask while testifying. However, at times the court directed witnesses to lower or remove their facemask, particularly where it was difficult to hear a witness's voice.

14.

There is also no description of the facemasks worn by appellant and witnesses. For purposes of our discussion, we assume the trial participants wore standard cloth facemasks covering the mouth and nose of the wearer.

Finally, it appears that Plexiglas barriers were installed in certain places in the courtroom, including in front of the witness stand.

## B.    Forfeiture

As a threshold matter, respondent argues appellant forfeited this claim on appeal by failing to object at trial. Appellant does not expressly concede forfeiture, but agrees his trial counsel did not object, and only addresses the instant claim in the context of ineffective assistance of counsel.

"As a general rule, a defendant's failure to object to an alleged trial error relieves an appellate court of the obligation to consider the claim on review.… We have applied this rule numerous times to find forfeiture of a constitutional right of confrontation claim." (*People v. Arredondo* (2019) 8 Cal.5th 694, 710.)

Here, appellant's failure to object is particularly problematic because it deprived the trial court of the opportunity to clarify the nature and extent of the facemask requirement at issue and "make additional findings on the record" relevant to appellant's claim. (*People v. Arredondo*, *supra*, 8 Cal.5th at p. 710.) Accordingly, the claim is forfeited.

## C.    Ineffective assistance of counsel

Appellant contends this court should still consider the merits of his confrontation claim, arguing his trial counsel was ineffective for failing to object below.

To prove ineffective assistance, appellant must show that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that, in the absence of counsel's failure, it is reasonably probable

that the result of the sentencing proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694.)

We conclude appellant's ineffective assistance of counsel claim fails because he cannot establish trial counsel's performance was deficient. Counsel is not required "to make a futile or meritless objection." (*People v. Reyes* (2016) 246 Cal.App.4th 62, 86; see *People v. Anderson* (2001) 25 Cal.4th 543, 587.) As we explain below, appellant's confrontation claim is without merit. In any event, appellant also cannot establish that he suffered prejudice because of counsel's allegedly deficient performance.

### 1. *Allowing witnesses to wear facemasks did not violate the Confrontation Clause.*

Appellant contends that by allowing witnesses to wear facemasks while testifying the court violated his right to face-to-face confrontation with the witnesses. Specifically, he argues the facemasks limited his ability, and the ability of the jury, to assess witness credibility.

"[T]he Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." (*Coy v. Iowa* (1988) 487 U.S. 1012, 1016.) However, this guarantee is not absolute. (*Craig*, *supra*, 497 U.S. at p. 847.) While "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' … it is not the *sine qua non* of the confrontation right." (*Ibid.*) Instead, " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.' " (*Id.* at p. 849.) Thus, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." (*Id.* at p. 850.)

Three California cases have held that trial court orders requiring witnesses to wear face coverings during the COVID-19 pandemic did not violate the Confrontation Clause. In *People v. Alvarez,* the court concluded the facemask requirement "served an important state interest in protecting the public from a contagious, and too often, lethal, disease," citing Centers for Disease Control and Prevention recommendations that individuals should wear facemasks, particularly indoors, to prevent the spread of COVID-19. (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 36–37 (*Alvarez*).) Responding to the defendant's claim that the reliability of testimony cannot be assured if witnesses are required to wear facemasks, *Alverez* observed that the "safeguards inherent in confrontation" were still present: (1) the witnesses testified in person, (2) were under oath, (3) were subjected to cross-examination, and (4) the defendant and the fact finder were able to view the demeanor of the witnesses to evaluate credibility. (*Id.* at p. 37, citing *Craig*, *supra*, 497 U.S. at pp. 845–846.) While *Alvarez* acknowledged that the witnesses' facemasks partially covered their faces, "significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable as was posture, tone of voice, cadence and numerous other aspects of demeanor." (*Id.* at p. 38.) *Alvarez* explained the jurors could " 'observe the witnesses from head to toe. They will be able to see how the witnesses move when they answer a question; how the witnesses hesitate; how fast the witnesses speak. They will be able to see the witnesses blink or roll their eyes, make furtive glances, and tilt their heads. The Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during particularly probative questioning.' " (*Ibid.*) *Alvarez* also noted that "nearly every state and federal court to consider the issue during [the] COVID-19 pandemic has found no confrontation violation because a witness was wearing a mask." (*Id.* at p. 38, fn. 7.)

*People v. Lopez* (2022) 75 Cal.App.5th 227 (*Lopez*) reached the same conclusion. It held that the trial court's facemask requirement "furthered the public policy of protecting against the substantial health risks presented by the COVID-19 virus," but did not "meaningfully diminish the face-to face nature of the witness testimony." (*Id.* at p. 234.)

*People v. Edwards*, *supra*, 76 Cal.App.5th 523 also rejected a Confrontation Clause challenge to a facemask requirement. The court reasoned: "[The defendant] enjoyed his right to confront the witnesses against him. He and the jurors saw and heard those witnesses. Under oath, the witnesses responded to [his] cross-examination. The jurors saw and heard the witnesses' reactions to the confrontation. The masks covered noses and mouths to minimize disease transmission. This was scrupulous adherence to the [the Sixth Amendment] during a public health emergency. The confrontation clause permits a judge to follow national safety guidelines." (*Id.* at p. 527.)

We see no reason to depart from these well-reasoned opinions. Here, while facemasks did obscure the nose and mouth of some witnesses, they did not, as appellant claims, meaningfully inhibit the assessment of witness credibility. Accordingly, we conclude requiring or allowing witnesses to testify with a facemask did not violate the confrontation clause because it was necessary to protect the trial participants from a deadly virus during a global pandemic.

Finally, to the extent appellant suggests facemasks were unnecessary because the court was equipped with Plexiglas shields, we follow *Lopez* in "declin[ing] to adopt a rule that would infringe on the inherent authority of trial courts to promulgate procedures best suited for their particular courtrooms as they confront the challenges presented by the global pandemic." (*Lopez*, *supra*, 75 Cal.App.5th at pp. 234–236.)

### 2. *Requiring appellant to wear a facemask did not violate his rights to confrontation or due process.*

Appellant also raises the related claim that the trial court's requirement that he wear a facemask violated his rights to confrontation and due process, because it prevented others in the courtroom from observing his facial expressions and emotional responses during trial. He compares the facemask requirement to the sedating effect of certain medications, which was at issue in *Riggins v. Nevada* (1992) 504 U.S. 127 (*Riggins*) and *People v. Gurule* (2002) 28 Cal.4th 557 (*Gurule*).

In *Gurule*, the court rejected the defendant's claim he was not " 'present' " for voir dire because he was under the influence of tranquilizers and sedating medications, finding there was no substantial evidence in the record the medication affected him. (*Gurule*, *supra*, 28 Cal.4th at p. 598.) However, in a footnote the court quoted from Justice Kennedy's concurring opinion in *Riggins* about the dangers of ensuring a criminal defendant's competence through involuntary medication. (*Gurule*, *supra*, 28 Cal.4th at p. 598, fn. 8.) In *Riggins,* the court reversed the defendant's conviction because throughout trial the state involuntarily administered antipsychotic medication in the "toxic range" that could cause "drowsiness or confusion" or a "sedation-like" effect. (*Riggins*, *supra*, 504 U.S. at pp. 137–138.) In the portion of his concurrence quoted by *Gurule*, Justice Kennedy observed: "It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. [Citation.] At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial.… The defendant's demeanor may also be relevant

19.

to his confrontation rights." (*Riggins*, *supra*, 504 U.S. at p. 142 (conc. opn. of Kennedy, J.); *Gurule*, *supra*, 28 Cal.4th at p. 598, fn. 8.)

We are unpersuaded by this analogy. Unlike tranquilizers or the antipsychotic medication at issue in *Riggins*, facemasks do not cause sedation, prevent the wearer from expressing emotion, or otherwise impact demeanor. Here, appellant's mask only partially obstructed the jury's view of his face. They could still see the top of his face, his eyes, and his body from head to toe, and thus could observe his body language, posture, and any physical gestures. This did not meaningfully hinder the jury's ability to observe his demeanor and emotions throughout trial. Accordingly, appellant fails to show the facemask requirement violated his constitutional rights, and therefore his counsel was not ineffective for failing to object.

### 3. *Appellant fails to demonstrate prejudice.*

To establish prejudice, the defendant must demonstrate a " 'reasonable probability' " that, absent defense counsel's alleged errors, the result would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Majors* (1998) 18 Cal.4th 385, 403.) It is not sufficient to show that the alleged errors may have had " 'some conceivable effect' " on the trial's outcome. (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 217.)

As we explained above, the facemasks had little impact on the trier of fact, as it did not meaningfully impact the ability of the jury to observe the demeanor of appellant or witnesses. Thus, we fail to see how the use of facemasks by trial participants impacted the outcome of appellant's trial.

Appellant identifies three witnesses who the record shows chose to leave their facemask on while testifying: a civilian who heard gunshots and observed Juan's vehicle after the crash, an officer who took a statement from the recreation center employee, and

20.

appellant's identification expert. However, the testimony of these witnesses was largely undisputed. There is no basis to conclude the jury's inability to see their nose and mouth while testifying impacted the outcome of his trial. On the other hand, the Alberty sisters, who were important witnesses for the prosecution, were not impacted by the court's facemask requirement, as the transcript of their prior testimony was read into the record. Accordingly, we conclude that even assuming defense counsel was ineffective for failing to object, appellant fails to demonstrate a reasonable probability that the outcome would have been different.

**III.    Senate Bill No. 81 Does not Apply Retroactively to Appellant.**

Appellant contends he is entitled to the retroactive application of Senate Bill No. 81 pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) because his matter is not final on appeal. We disagree.

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add subdivision (c) which provides, in part:

> "(1)  Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2)  In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [listed] mitigating circumstances … are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(1)-(2).)

The mitigating circumstances listed in subdivision (c) of section 1385 include that if "[t]he application of an enhancement could result in a sentence of over 20 years … the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(C).) Additionally, if "[m]ultiple

enhancements are alleged in a single case … all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)

Senate Bill No. 81's amendments to section 1385 expressly apply to "all sentencings occurring after January 1, 2022." (§ 1385, subd. (c)(7).) Appellant was sentenced on June 4, 2021. Thus, Senate Bill No. 81 does not apply to appellant.

Appellant's reliance on *Estrada* is misplaced. Under *Estrada*, we presume, absent evidence to the contrary, that an amendatory statute "mitigat[ing] the possible punishment for a class of persons" is "presumptively retroactive and applie[s] to all persons whose judgments were not yet final at the time the statute took effect." (*People v. Frahs* (2020) 9 Cal.5th 618, 624.) However, as our high court has explained, "[t]he rule in *Estrada*, of course, is not implicated where the Legislature clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent." (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.)

Here, Senate Bill No. 81 includes an express savings clause. It unequivocally states that the amendments to section 1385, subdivision (c), apply "to all sentencings occurring after January 1, 2022." Therefore, Senate Bill No. 81 does not apply retroactively to appellant.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

22.